IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **RONALD K. HOOKS**, Regional Director of the Nineteenth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>                     Petitioner,<br><br>     v.<br><br>**INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 8**; **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 40**; and **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION**,<br><br>                     Respondents. | Case No.: 3:12-cv-1088-SI<br><br><br><br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Anne P. Pomerantz, Mara-Louise Anzalone, National Labor Relations Board, Region 19, 915 Second Avenue, Room 2948, Seattle, Washington  98174; Lisa J. Dunn, National Labor Relations Board, Subregion 36, 601 SW Second Avenue, Suite 1910, Portland, Oregon 97204. Of Attorneys for Petitioner.

Robert Remar, Eleanor Morton, and Philip Monrad, Leonard Carder, LLP, 1188 Franklin St. #201, San Francisco, California  94109; Robert Lavitt, Schwerin, Campbell, Barnard, Iglitzin and Lavitt, LLP, 18 West Mercer Street, Suite 400, Seattle, Washington  98119-3871. Of Attorneys for Respondents.

**SIMON, District Judge**.

This matter involves a labor dispute occurring at Terminal 6 at the Port of Portland that is the subject of three related lawsuits before the Court.[1] Briefly stated, the dispute concerns which union—the International Longshore and Warehouse Union ("ILWU") or the International Brotherhood of Electrical Workers ("IBEW")—should be assigned the work of plugging in, unplugging, and monitoring refrigerated shipping containers at Terminal 6 (the "reefer work"). The ILWU and the Pacific Maritime Association ("PMA") contend that their collective bargaining agreement—the Pacific Coast Longshore Contract Document—requires ICTSI Oregon, Inc. ("ICTSI"), the operator of Terminal 6 and a PMA member, to assign the reefer work to ILWU members. ICTSI, the Port of Portland, and the IBEW Local 48 contend that other contracts—including the Terminal 6 Lease Agreement—require that the reefer work be assigned to IBEW members. In this suit, Petitioner Ronald K. Hooks', the Regional Director for the National Labor Relations Board ("NLRB" or "Petitioner"), is seeking to enjoin Respondents ILWU and its two locals, Local 8 and Local 40 (collectively "Respondents"), from engaging in work stoppages and slowdowns during the pendency of an NLRB adjudication into the reefer work dispute. Dkt. 1.

Before the Court is the NLRB's Petition for Civil Contempt. Dkt. 26. On July 3, 2012, the Court granted the NLRB's motion for a temporary restraining order, brought under Section 10(l) of the National Labor Relations Act, 29 U.S.C. § 160(l), and enjoined Respondents from engaging in work stoppages and slowdowns at Terminal 6 at the Port of Portland. Dkt. 25. Petitioner contends that on July 4, 2012, one day after the Court issued its Order, ILWU

---

[1] The other two actions are *Int'l Longshore and Warehouse Union v. ICTSI Oregon, Inc.*, 3:12-cv-01058-SI, and *Pac. Maritime Assoc. v. Int'l Longshore and Warehouse Union Local 8*, 3:12-cv-01100-SI.

Page 2 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

members engaged in a work slowdown while working on the ship MV Cape Manila at Terminal 6. Respondents argue that their members performed work within the normal range of productivity. For the reasons stated below, the Court finds that there is not "clear and convincing" evidence that Respondents violated the Court's Order of July 3, 2012. Accordingly, Petitioner's motion for civil contempt, Dkt. 26, is denied.

## FINDINGS OF FACT

1. On July 3, 2012, the Court granted Petitioner's motion for a temporary restraining order, brought under Section 10(l) of the National Labor Relations Act, 29 U.S.C. § 160(l). The Court's Order enjoined Respondents from engaging in work stoppages and slowdowns at Terminal 6 at the Port of Portland. Dkt. 25. The Order also required Respondents, "within three (3) days, [to] provide to each of their officers, representative, employees, agents and members involved with work performed at Terminal 6 a copy of this Order and a [] clear written directive to refrain from engaging in any conduct inconsistent with this Order." *Id.*

2. The Court's temporary restraining order also required Respondents to provide the PMA and companies that do business with the Port of Portland "a copy of this Order and written notice that Respondents will comply with this Order." Dkt. 25.

3. The Court's temporary restraining order further required Respondents to "file with the District Court and serve a copy upon the Petitioner, a sworn affidavit from a responsible official which describes with specificity how it has complied with the terms of this Order." Dkt. 25.

4. Respondents have not filed the sworn affidavits describing how they have complied with the Court's July 3, 2012 Order. Respondents also have not served on Petitioner copies of

affidavits describing how they have complied with the Court's July 3, 2012 Order. *See* Pet.'s Reply Br. at 4.

5. The MV Cape Manila arrived at Terminal 6 at 4:00 a.m. on July 4, 2012, to discharge and load containers. Affidavit of Brian A. Yockey ("Yockey Aff.") at 3 (Dkt. 26-1, Ex. A); Affidavit of Kelly Roby ("Roby Aff.") at 2 (Dkt. 26-1, Ex. A).

6. All of the ILWU members scheduled to work the morning shift arrived to work on time at 8:00 a.m. Yockey Aff. at 3; Roby Aff. at 2.

7. At approximately 8:10 a.m., Brian Yockey, the ICTSI Marine Manager, and Kelly Roby, the ICTSI Stevedore Manager, observed a problem with the one of the cranes on Terminal 6. Yockey Aff. at 4-6; Roby Aff. at 2-3. Both Yockey and Roby stated that an ILWU crane operator refused to operate a crane until mechanical and safety issues had been resolved. *Id.* There is no dispute that there was a legitimate mechanical problem with the crane. Yockey Aff. at 6. The mechanical and safety issues associated with the crane were resolved and the crane operator returned to work after about 10 to 15 minutes. *Id.*

8. Trucks operated by ILWU Local 8 members drove slower during the first part of the first shift. Yockey and Roby both observed trucks being driven by ILWU members that were moving slowly. Yockey Aff. at 6-7; Roby Aff. at 3-4. Roby observed truck drivers stopping at the "coning station[] for 10 to 30 seconds each." Roby stated that in "normal operations, the trucks do not stop for a long period of time. They simply observe the stop sign and immediately proceed[.]" *Id.* Yockey observed a "driver stop at a cone station" for 30 seconds. Yockey Aff. at 7.

9. Representatives of ILWU Local 8, ICSTI, and the Pacific Maritime Association ("PMA") met at approximately 1:15 p.m. to discuss whether ILWU members were engaged in a work

Page 4 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

slowdown. Affidavit of Jim Mullen ("Mullen Aff.") at 4 (Dkt. 26-1, Ex. A). The parties could not agree. A PMA employee requested that an arbitrator come to the Port to arbitrate the dispute. *Id.* An Area Arbitrator, Jan Holmes, arrived at Terminal 6 at approximately 2:10 p.m. on July 4. At approximately 2:45 p.m., Arbitrator Holmes held a hearing into whether ILWU members were engaged in a work slowdown. Dkt. 44. Arbitrator Holmes issued a handwritten decision at approximately 6:30 p.m. on July 4. Dkt. 26-1, Ex. B. Arbitrator Holmes issued a longer, typewritten decision on July 6. Dkt. 44.

10. Productivity during the first half of the first shift was below average. Yockey observed that "[w]e had a total of 67 moves between 8:00 a.m. and 10:00 a.m. for the two [ILWU] gangs combined. Based on my knowledge of the skills of the operators, and accounting for the downtime that we did have, I would have expected about 100 moves total in that two hour period." Yockey Aff. at 6. Roby stated that the morning "production figures . . . were low compared to previous calls by this ship[.]" Roby Aff. at 4. The Arbitrator found "ILWU Local 8, its officers and members[,] are guilty of a slowdown on July 4, 2012[.]" Dkt. 26-1, Ex. B. In the Arbitrator's July 6 decision, she added: "It is evident that for the first half of the first shift of July 4, 2012, production was well below the normal range." Dkt. 44.

11. ICTSI hired additional ILWU members to report to the second shift on July 4 because ICTSI was concerned about the pace of productivity. Yockey explained that the "work slowdown caused us to order at least one extra gang for the second shift." Yockey Aff. at 9. Mullen stated that Hapag-Lloyd, the operator of MV Cape Manila, requested that ICTSI hire extra labor so that the ship would be ready to leave port on schedule at 3:00 a.m. on July 5. Mullen Aff. at 6.

Page 5 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

12. The pace of productivity increased during the second part of the first shift and during the second shift. Roby "did not see anyone driving as slow as they had that morning" when he watched the trucks after 1:00 p.m. Roby Aff. at 5. Yockey stated that the "second shift worked at a better, but slightly below normal, production rate." Yockey Aff. at 9. Arbitrator Holmes found that "commencing after the meal hour and throughout the second half of the shift, production increased substantially; well into the normal range of productivity." Dkt. 44.

13. The MV Cape Manila departed on time from Terminal 6. Mullen Aff. at 6.

14. There is no direct evidence that ILWU, or its locals, officers, or members, organized or directed a work slowdown on July 4.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter, pursuant to 29 U.S.C. § 160(l). The Court has the authority to issue injunctive relief. 29 U.S.C. § 160(l).

2. This Court has the authority to find a party in civil contempt of the Court's order. The Court "has the power to adjudge in civil contempt any person who willfully disobeys a specific and definite order of the court." *Gifford v. Heckler*, 741 F.2d 263, 265 (9th Cir. 1984). "A person fails to act as ordered by the court when he fails to take all the reasonable steps within his power to insure compliance with the court's order." *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146-47 (9th Cir. 1983) (internal citations and quotation marks omitted). To sustain a motion for contempt of an injunction issued pursuant to Section 10(l), the NLRB must prove the elements of contempt with evidence that is "clear and convincing." *Nat'l Labor Relations Bd. v. San Francisco Typographical Union No. 21*, 465 F.2d 53, 57 (9th Cir. 1972); *Nat'l Labor Relations Bd.v. Ironworkers Dist. Council of Pac. Nw.*, 884 F.2d 1395 (9th Cir. 1989) (unpublished) ("The NLRB must prove every element of contempt by clear and convincing

evidence."). Clear and convincing evidence "requires more than proof by a preponderance of the evidence and less than proof beyond a reasonable doubt." *Singh v. Holder*, 649 F.3d 1161, 1168 (9th Cir. 2011). To meet the clear and convincing standard, "a party must present sufficient evidence to produce 'in the ultimate factfinder an abiding conviction that the truth of its factual contentions are . . . highly probable.'" *Sophanthavong v. Palmateer*, 378 F.3d 859, 866-67 (9th Cir. 2004) (quoting *Colorado v. New Mexico,* 467 U.S. 310, 316 (1984)).

3. Petitioner has not proved by clear and convincing evidence that Respondents willfully disobeyed the Court's Order of July 3, 2012. Petitioner has not presented any direct evidence that Respondents willfully disobeyed the Court's Order on July 4, 2012. The circumstantial evidence demonstrates that the rate of productivity was below average over the course of July 4, especially during the first part of the first shift. The pace of production, however, was not so slow as to compel the Court to find that Respondents willfully disobeyed the Court's Order. The Court notes that productivity markedly improved throughout the day and that the MV Cape Manila left Terminal 6 on time.

4. The affidavits from Brian Yockey and Kelly Roby establish that several ILWU truck drivers drove slowly between 8:00 a.m. and 10 a.m. on July 4. This evidence does not, however, clearly and convincingly demonstrate that Respondents willfully disobeyed the Court's Order. Instead, this evidence only shows that some ILWU truck drivers worked slowly in the morning. Such sporadic instances of slow work are not sufficient by themselves to prove by clear and convincing evidence that Respondents engaged in a work slowdown. *See Schauffler v. Local 1291, Int'l Longshoremen's Ass'n*, 292 F.2d 182, 190 (3d Cir. 1961) (holding that "sporadic refusals" to work are not enough to clearly and convincingly show that union disobeyed court order). Moreover, the Court notes that its Order provided that Respondents

had three days in which to direct their members to refrain from engaging in work slowdowns. On the morning of July 4, it had been less than 24 since the Court had issued its Order of July 3. Accordingly, it is possible that some individual ILWU members were not yet aware of the Court's Order.

5. Petitioner argues that Respondents are also in contempt because they failed to comply with the Court's Order that Respondents file with the Court and serve on Petitioner affidavits describing how Respondents have complied with the Court's Order of July 3. Pet.'s Reply Br. at 4. The Court declines to address this argument because it was raised for the first time in Petitioner's reply brief. *Ass'n of Irritated Residents v. C & R Vanderham Dairy*, 435 F. Supp. 2d 1078, 1089 (E.D. Cal. 2006) ("It is inappropriate to consider arguments raised for the first time in a reply brief."). Nonetheless, the Court takes its orders very seriously. The Preliminary Injunction, granted on July 19, 2012, Dkt. 50, contains notice provisions—similar to those in the Court's Order of July 3—requiring Respondents to confirm that they are complying with the Court's Order. The Court will not hesitate to find Respondents in contempt should Respondents intentionally fail to comply with these provisions.

6. Petitioner's motion for civil contempt, Dkt. 26, is denied without prejudice. Should further evidence develop showing that Respondents are engaging in a work slowdown, or otherwise willfully disobeying the Court's orders, Petitioner may file a new motion for contempt.

IT IS SO ORDERED.

Dated this 20th day of July, 2012.

/s/ Michael H. Simon
_____
Michael H. Simon
United States District Judge