# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **RONALD K. HOOKS**, Regional Director of the Nineteenth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>    Petitioner,<br><br>  v.<br><br>**INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 8**; **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 40**; and **INTERNATIONAL LONGSHORE AND WAREHOUSE UNION**,<br><br>    Respondents. | Case No. 3:12-cv-01088-SI<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Anne P. Pomerantz, John H. Fawley, NATIONAL LABOR RELATIONS BOARD, Region 19, 915 Second Avenue, Room 2948, Seattle, WA 98174; Helena A. Fiorianti, NATIONAL LABOR RELATIONS BOARD, Subregion 36, 1220 SW Third Avenue, Suite 605, Portland, Oregon 97204. Of Attorneys for Petitioner.

Robert Remar, Eleanor Morton, and Emily M. Maglio, LEONARD CARDER, LLP, 1188 Franklin St. #201, San Francisco, CA 94109; Robert Lavitt, SCHWERIN, CAMPBELL, BARNARD, IGLITZIN AND LAVITT, LLP, 18 West Mercer Street, Suite 400, Seattle, WA 98119-3871. Of Attorneys for Respondents.

Michael Garone, SCHWABE WILLIAMSON & WYATT, PC, 1211 S.W. Fifth Avenue, Suite 1900, Portland, OR 97204. Of Attorneys for Charging Party ICTSI, Oregon, Inc.

**Michael H. Simon, District Judge.**

This matter is one of five separate but related actions arising from a labor dispute at Terminal 6 at the Port of Portland. Briefly stated, the dispute concerns who is entitled to perform the work of plugging in, unplugging, and monitoring refrigerated shipping containers (the "reefer work") at the container facility at Terminal 6 ("Terminal 6").[1] The International Longshore and Warehouse Union ("ILWU") and the Pacific Maritime Association ("PMA") contend that their collective bargaining agreement—the Pacific Coast Longshore Contract Document ("PCLCD")—requires ICTSI Oregon, Inc. ("ICTSI"), the operator of Terminal 6 and a PMA member, to assign the reefer work to ILWU members. ICTSI, the Port of Portland (the "Port"), and the International Brotherhood of Electrical Workers ("IBEW") Local 48 contend that other contracts—including the Terminal 6 Lease Agreement between the Port and ICTSI, and the District Council of Trade Unions' ("DCTU")[2] bargaining agreement with the Port require that the reefer work be assigned to IBEW members. Petitioner Ronald K. Hooks ("Petitioner") brought this action under § 10(l) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(l), in response to allegations that ILWU, ILWU Local 8 ("Local 8"), and ILWU Local 40 ("Local 40") (collectively "Respondents"), were engaging in work slowdowns and stoppages at Terminal 6.

On July 19, 2012, on Petitioner's petition, Dkt. 1, the Court issued a preliminary injunction under § 10(l), enjoining Respondents from engaging in certain work slowdowns and

---

[1] The other four cases are *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, Case No. 3:12-cv-01058-SI; *Pac. Mar. Ass'n v. Int'l Longshore & Warehouse Union Local 8*, Case No. 3:12-cv-01100-SI; *Int'l Longshore & Warehouse Union v. Port of Portland*, Case No. 3:12-cv-01494-SI; and *Hooks v. Int'l Longshore & Warehouse Union*, Case No. 3:12-cv-01691-SI.

[2] The DCTU is the party to the collective bargaining agreement with the Port that covers IBEW electricians who perform the reefer work.

PAGE 2 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

stoppages at Terminal 6. Dkt. 50 ("July 19 Injunctive Order"). The Court also ordered

Respondents to notify their members and officials of the preliminary injunction and provide "a

clear written directive to refrain from engaging in any conduct inconsistent with this Order."

Petitioner alleges that Respondents have continued to engage in work slowdowns and

stoppages from July 20, 2012, in violation of the Court's preliminary injunction. Petitioner also

alleges that Respondents failed properly to notify their officials and members, as required in the

July 19 Injunctive Order. Before the Court is Petitioner's motion for an order to show cause and

petition for civil contempt. Dkt. 65. For the reasons stated below, the Court finds that there is

clear and convincing evidence that the ILWU and Local 8 violated the Court's preliminary

injunction by engaging in unlawful secondary boycott activities from July 20, 2012 through

August 13, 2013. The Court finds that Petitioner fails to meet its burden to show a violation of

the Court's Injunction Order by Local 40 during any relevant time period, by the ILWU and

Local 8 from August 14, 2013 through September 15, 2014, and by all Respondents with respect

to compliance with that portion of the Court's order regarding the required notification.

Accordingly, Petitioner's motion for contempt is granted in part and denied in part.[3]

## FINDINGS OF FACT

The Court has considered the decisions of Administrative Law Judge ("ALJ") Jeffrey D.

Wedekind and ALJ William L. Schmidt,[4] the administrative record before ALJ Wedekind, the

admissible evidence filed with this Court, the arguments and briefs by counsel, and the record in

this case. The Court has considered the admissible portions of the declarations of Petitioner's

---

[3] Respondents asserted numerous evidentiary objections, which are addressed in a separate Evidentiary Order filed concurrently with this Opinion and Order.

[4] The Court gives special deference to the ALJ's findings that are based on determinations of credibility. *See Underwriters Labs. Inc v. NLRB*, 147 F.3d 1048, 1051 (9th Cir. 1996); *NLRB v. Domsey Trading Corp.*, 1992 WL 175667, at * 1 (E.D.N.Y. July 14, 1992).

witnesses[5] Shawn Ball, Stevedore Manager for ICTSI; Dan Pippenger, General Manager of

Marine Operations for the Port; Kelly Roby, former Assistant Terminal Manager and current

Terminal Manager for ICTSI; Bill Wyatt, Executive Director for the Port; and Brian Yockey,

former Terminal Manager and current Director of Labor Relations for ICTSI. The Court has also

considered the declarations of Respondent's witnesses Craig Bitz, former lead crane mechanic at

Terminal 6 and member of Local 8; Michael Gardner, longshoreman, crane operator, and

member of Local 8; Steve Hennessy, Senior Vice President of Labor Relations and Chief

Operating Officer for the PMA; Dane Jones, Secretary-Treasurer/Business Agent of Local 40;

John Miken, steady mechanic and member of Local 8; John Mulcahy, longshoreman, crane

operator, and member of Local 8; Michael Palmer, registered walking boss and member of

ILWU Local 92; John Gregory Phillips, steady vessel planner and member of Local 40; Stuart

Strader, longshoreman, crane mechanic, and Labor Relations Committee representative for Local

8; and Leal Sundet, Coast Committeeman of the Coast Longshore Division for the ILWU. The

Court makes the following findings of fact.

**A. Procedural Background**

      1.      On June 18, 2012, Petitioner filed a petition for a temporary restraining order

pursuant to § 10(l) of the NLRA, 29 U.S.C. § 160(l). Dkt. 1. Petitioner claimed that Respondents

were engaging in acts and conduct that violated §§ 8(b)(4)(i) and (ii)(B) of the NLRA, 29 U.S.C.

§§ 158(b)(4)(i) and (ii)(B).

      2.      Petitioner alleged that "Respondents have been engaged in a labor dispute with

the Port regarding the performance of the plugging, unplugging and monitoring of refrigerated

containers on the dock at Terminal 6." Petitioner further alleged that Respondents engaged in

---

[5] Witness declarations are cited herein as "[Last Name] Decl."

PAGE 4 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

unlawful conduct in support of Respondents' position in their labor dispute with the Port and to ensure that the disputed reefer work was assigned to ILWU workers.

      3.      On June 21, 2012, Petitioner filed a motion for a preliminary injunction. Dkt. 10. This motion was based on the same alleged facts and violations of law as described in Petitioner's motion for a temporary restraining order.

      4.      On July 3, 2012, the Court issued a temporary restraining order. Dkt. 25. The Court's Order enjoined Respondents from engaging in work stoppages and slowdowns at Terminal 6 with an object to force or require ICTSI to stop or cease doing business with the Port.

      5.      On July 6, 2012, Petitioner filed a petition for civil contempt, alleging that on July 4, 2012, Respondents engaged in a work slowdown that violated the temporary restraining order. Dkt. 26.

      6.      On July 19, 2012, the Court issued the requested preliminary injunction. The Court's preliminary injunction enjoined Respondents from

> engaging in slowdowns, stoppages, withholding of services, or threatening, coercing, or restraining ICTSI Oregon, Inc., or any other person engaged in commerce . . . where in any case an object thereof is to force or require ICTSI Oregon, Inc., or any other person engaged in commerce . . . to cease handling, using, selling, transporting, or otherwise dealing in the products of, or to cease doing business with the Port of Portland, or any other person engaged in commerce . . . or with each other.

Dkt. 50 at 3.

      7.      As part of the Court's Order on July 19, 2012, the Court ordered Respondents to, "within five (5) days, provide to each of their officers, representatives, employees, agents, affiliated locals, and members involved with work performed at Terminal 6 a copy of this Order and a clear written directive to refrain from engaging in any conduct inconsistent with this Order." Dkt. 50 at 3.

PAGE 5 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

8.      Also on July 19, 2012, the Court denied Petitioner's petition for civil contempt (Dkt. 51) and issued Findings of Fact and Conclusions of Law to that effect on July 20, 2012 (Dkt. 52).

9.      On July 24, 2012, counsel for Respondents filed a declaration stating that he sent notice of the Court's preliminary injunction to the ILWU, Local 8, Local 40, and ILWU Local 92. Dkt. 53 at 2. He further stated that, upon information and belief, the notice was posted in key locations where longshoreman and marine clerks who work at Terminal 6 gather and perform work, including at locations at Terminal 6 and in the union halls.

10.      No objections or motions were filed in response to the declaration submitted by ILWU counsel relating to the notice provided to the ILWU and its locals and members.

11.      On August 13, 2012, a three-member panel of the National Labor Relations Board ("NLRB") issued a decision pursuant to § 10(k) of the NLRA, 29 U.S.C. § 160(k), concluding that IBEW members are entitled to perform the reefer work and not ILWU members. *Int'l Bd. of Elec. Workers*, 358 NLRB No. 102, 2012 WL 3306478 (Aug. 13, 2012). The ILWU entities appealed this decision.

12.      Between July 31, 2012 and August 29, 2012, ALJ Schmidt conducted 12 days of hearings relating to consolidated cases brought before the NLRB alleging that Respondents engaged in unlawful secondary boycott activity from May 21, 2012 through June 10, 2012.

13.      On August 28, 2013, ALJ Schmidt issued a Decision and Recommended Order, finding that from May 21, 2012 through June 10, 2012, Respondents engaged in unlawful secondary boycott activity, including by threatening ICTSI and engaging in unlawful work stoppages and slowdowns. Dkt. 65-4 at 2-55; *also available at Int'l Longshore and Warehouse Union, AFL-CIO, et al.*, 2013 WL 4587186 (Aug. 28, 2013).

14.     In November and December 2013, ALJ Wedekind held a 12-day hearing on a case before the NLRB alleging that Respondents engaged in unlawful secondary boycott activity from September 2012 through June 2013.

15.     On May 30, 2014, ALJ Wedekind issued a Decision, finding that the ILWU and Local 8 violated the NLRA by engaging in unlawful secondary boycott activity, including inciting or encouraging unlawful slowdowns. Dkt. 65-4 at 57-75; *also available at Int'l Longshore and Warehouse Union, AFL-CIO, et al.*, 2014 WL 2453202 (Aug. 28, 2013). ALJ Wedekind dismissed the claims against Local 40.

16.     On September 15, 2014, the NLRB filed a petition for an order of civil contempt with this Court, alleging that Respondents had consistently engaged in unlawful secondary boycott activities, including work stoppages and slowdowns, since the Court issued the preliminary injunction. Petitioner alleges that Respondents engaged in the alleged conduct with an unlawful purpose of causing neutral employers, including ICTSI, to pressure the Port of Portland to assign its reefer work to Local 8's members.

17.     On October 21, 2014, the Court held a hearing on the petition. The Court heard arguments of counsel for Petitioner and Respondents. No party proffered any witnesses at the hearing. The Court permitted supplemental briefing, which was filed by both parties on October 31, 2014 and November 7, 2014.

**B.  Factual Background**

18.     For approximately 37 years, the Port, either directly or through a stevedoring contractor, managed Terminal 6 and hired IBEW members to perform the reefer work at Terminal 6. In May 2010, ICTSI entered into a lease with the Port to take over management of the Terminal 6 container facility, beginning on February 12, 2011. For purposes of the July 19 Injunctive Order and the alleged contumacious conduct, the Port is considered the "primary"

PAGE 7 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

employer with respect to the labor dispute over the reefer work and ICTSI and the shipping carriers are considered "neutrals" in this dispute.[6]

19.     The productivity of ILWU members at Terminal 6 is measured in gross productivity, adjusted gross productivity, and net productivity. Gross productivity equals the total number of moves completed divided by all hours for which workers were paid. Adjusted gross productivity equals total moves divided by gross hours, minus "exogenous" delays such as a late vessel or bad weather. Net productivity equals total moves divided by hours actually worked, meaning adjusted gross productivity minus operations delays such as mechanical or equipment problems. Dkt. 104-16 at 13. The Court was provided with only gross and net productivity data for the relevant time period. Because net productivity also incorporates the "exogenous" delays that are factored in analyzing adjusted gross productivity, the Court considers gross productivity and net productivity sufficient to analyze the alleged work stoppages and slowdowns.

20.     Between January 1, 2010, and June 1, 2012, the average gross moves per hour at Terminal 6 were 23.1 and the average net moves per hour were 27.5. *Id.*; Yockey Decl. ¶ 4 (Dkt. 83-1 at 4). In April and May 2012, when ICTSI had been managing Terminal 6 for more than a year, productivity was high. In April 2012, average gross moves per hour were 24.2, and in May 2012, average gross moves per hour were 24.8. Work stoppages and slowdowns began as a result of the labor dispute regarding the reefer jobs on June 1, 2012. Dkt. 104-16 at 19.

21.     Beginning in March 2012 and continuing through August 21, 2012, Local 8 members began filing grievances against ICTSI and the shipping carriers seeking lost pay for

---

[6] ALJ Schmidt concluded that the Port has the right to control assignment of the reefer work, but that conclusion is currently on appeal before the NLRB. This Court has stayed making a determination of whether the Port or ICTSI has the authority to control assignment of the reefer work until the NLRB makes a final determination.

PAGE 8 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

longshore workers for each occasion when IBEW workers performed the reefer work. Dkt. 65-4 at 19. An arbitration hearing was scheduled relating to these grievances.

22.     On or about May 21, 2012, ILWU's Coast Committeemen Sundet threatened ICTSI's CEO, Elvis Ganda. Sundet threatened, among other things, that if the reefer work was not assigned to ILWU members: (1) ICTSI "would pay the price;" (2) ILWU can "fuck" ICTSI; (3) Sundet "can fuck [ICTSI] badly;" (4) Sundet would make sure that Hanjin Shipping Co. Ltd. ("Hanjin"), the Port's largest carrier, did not renew its contract with ICTSI when the then-current contract expired; and (5) the PMA could fine and expel ICTSI. When Ganda commented that he felt like the Port had a "gun to his head" based on a clause in the lease agreement requiring the Port to assign the reefer work and that Sundet had another gun to Ganda's head, Sundet responded that Ganda needed to decide "which gun's got the bigger bullet." Sundet said that he did not believe that the Port would react negatively if ICTSI took the position in the NLRB 10(k) proceeding that ICTSI could assign the reefer work to ILWU members. Sundet added that the Port "barely" got ICTSI to sign a lease and that the Port had "nobody else out there." *Id.* at 22, 24, 46-47.

23.     On May 24, 2012, Sundet stated on two separate occasions that ILWU was going to "shut down" ICTSI's operations unless ICTSI began using Local 8 members to perform the reefer work. Sundet also told Terminal Manager Jim Mullen that ICTSI had to assign the reefer work to ILWU members, even it meant breaking the lease with the Port. When Mullen replied that he did not see that happening, Sundet replied that "you might as well tell Hanjin and [Hapag-Lloyd AG, another shipping line] to pack up because we're going to send them packing." According to Mullen, business from Hanjin and Hapag combined account for nearly 98 percent of ICTSI's work at Terminal 6. *Id.* at 24-25, 46-47.

PAGE 9 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

24.    On May 25, 2012, Local 8 President Jeff Smith threatened Ganda that the ILWU and Local 8 would cause Hanjin to stop doing business at the Port if the reefer work was not assigned to Local 8 members. Smith stated that the ILWU would put ICTSI out of business and would run every Hanjin container out of Portland. *Id.* at 25-26, 46-47.

25.    From June 1, 2012 through July 19, 2012, when the Court issued the preliminary injunction, work stoppages and slowdowns occurred as a result of the labor dispute over the reefer jobs and productivity at Terminal 6 dramatically declined, to average gross moves per hour of 16.9 and average net moves per hour of 19.7. Dkt. 104-16 at 8.

26.    ALJ Schmidt found that in 2012 Respondents "orchestrated a systematic sabotage of ICTSI's operations at T6 between June 1 and 10 that also adversely affected the operations of the carriers." Dkt. 65-4 at 47. ALJ Schmidt further found that Respondents engaged in conduct from May 21 through June 10, 2012, that pressured ICTSI and the shipping carriers with an object "to seek the relinquishment of the Port's control over the dockside reefer work for the benefit of the ILWU-represented workers at T6." *Id.* ALJ Schmidt concluded that "[b]y engaging in conduct disruptive of the operations of ICTSI and the carriers at T6 in order to cause the Port to relinquish its control over the dockside reefer work, Respondents violated Section 8(b)(4)(i) and (ii)(B) as alleged." *Id.* at 48.

27.    ALJ Schmidt also concluded that Respondents violated Section 8(b)(4)(D) by continuing to file lost pay grievances whenever IBEW electricians performed the reefer work. *Id.*

28.    ALJ Schmidt issued conclusions of law, including:

> 4. By threatening or impliedly threatening to shut down or
> otherwise disrupt ICTSI's operations at Terminal 6 in Portland,
> Oregon, in order to force or require ICTSI or any other person to
> cease doing business with the Port or any other person,
> Respondents have engaged in unfair labor practices . . . .

> 5. By failing and refusing to fulfill ICTSI's timely requests for the referral of qualified employees for work at Terminal 6 in accord with the Pacific Coast Longshore and Clerks Agreement in order to force or require ICTSI or any other person to cease doing business with the Port or any other person, Respondents have engaged in unfair labor practices . . . .
>
> 6. By inducing and encouraging employees to withhold their services, to engage in slowdowns and work stoppages, or to interfere with the lawful and proper work assignments of other employee groups that perform services at Terminal 6 in Portland, Oregon, in order to force or require ICTSI or any other person to cease doing business with the Port or any other person, Respondents have engaged in unfair labor practices . . . .

*Id.* at 50.

### a.  The time period from July 19, 2012 through August 13, 2013

29.     After the Court issued the July 19 Injunctive Order, a copy of the injunction was posted in the Local 8 hall. Miken Decl. ¶ 4, Ex. C (Dkt. 78 at 2, 41-42); *see also* Strader Decl. ¶ 92 (Dkt. 73 at 29). A notice was posted with the copy of the injunction (the "ILWU Injunction Notice") that informed ILWU members that the ILWU "strongly believe[s] that the injunction is legally wrong," that the ILWU is posting the notice "under protest," that ICTSI is the "cause of the problem" by failing to assign the reefer work to ILWU members, that the ILWU "will win this dispute," and that "justice will prevail." Miken Decl. Ex. A (Dkt. 78 at 7). The notice also stated that "we [ILWU] ask that everyone so involved please read [the July 19 Injunctive Order] and follow our clear written directive to refrain from engaging in any conduct inconsistent with the Injunction." *Id.*

30.     The ILWU Injunction Notice and copy of the injunction was also posted at Terminal 6. Bitz Decl. ¶¶ 4-5 (Dkt. 77 at 3).

31.     The fall in productivity at Terminal 6 coincided with the dispute regarding the assignment of the reefer jobs. It began on June 1, 2012 and although productivity improved after

the July 19 Injunctive Order, productivity was still significantly below pre-June 1, 2012 averages. From July 20, 2012 through August 11, 2013, the average gross moves per hour were 20 and the average net moves per hour were 23.8. Dkt. 104-16 at 8.

32.    The decline in productivity at Terminal 6 is statistically significant and economically meaningful. *Id.* at 16-18; Yockey Decl. ¶ 4 (Dkt. 83-1 at 4). The loss of even one move per hour is significant because ICTSI charges its customers by containers moved. Yockey Decl. ¶ 4 (Dkt. 83-1 at 4).

33.    Respondents contend that the decline in productivity was caused by poor management by ICTSI that resulted in equipment shortages and failures, an unsustainable reduction in labor, a hostile work environment, and extensive turnover of management personnel.

34.    The expert report of Dr. Bryce Ward concludes that the labor dispute over the reefer jobs is the most probable explanation for the decline in productivity at Terminal 6 from June 1, 2012 through August 13, 2013. Dr. Ward analyzed whether other factors could be the cause, including external factors such as weather, changes in management, changes in labor, problems with the equipment, and the quantity of equipment, and found that the evidence showed that these other factors could not explain the decline in productivity. Dkt. 104-16 at 19-30.

35.    The vessels involved do not explain the fall in productivity. Approximately 60 percent of the vessels serviced at Terminal 6 also were serviced before the labor dispute began, yet the average number of moves per vessel shrank by approximately 100. *Id.* at 20.

36.    Based on Dr. Ward's regression analysis, other external factors, such as weather, also do not explain the fall in productivity. *Id.* at 20-21.

PAGE 12 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

37.     Internal factors also do not explain the fall in productivity. With minor exceptions, the land and equipment used to move containers did not change from before and after the fall in productivity, including the layout of the terminal, the cranes, the trucks, the reach stackers, and the relevant software. *Id.* at 22.

38.     Reported equipment problems did, however, increase during the time period from July 19, 2012 through August 13, 2013. For example, equipment operators were 11.1 percent more likely to report a crane electrical problem, 2.9 percent more likely to report a crane mechanical problem, and 1.9 percent more likely to report a terminal equipment problem, than during the period measured from January 1, 2010 through June 1, 2012. *Id.* This resulted in increased time lost due to reported equipment problems.

39.     Dr. Ward noted that from the time period between June 1 and July 19, 2012, reported equipment problems "surged." *Id.* at 23. He further noted that reported equipment problems "collapsed" after the July 19 Injunctive Order, although remained higher than historical averages. *Id.* at 8, 23. Dr. Ward concluded that the direct correlation between labor disputes and increased reports of equipment problems showed that the "elevated propensity for equipment problems [from July 19, 2012 through August 13, 2013] may be the result of worker efforts to slow the operation." *Id.* at 23.

40.     Even assuming the increased downtime due to equipment problems reflect real problems with equipment, the equipment problems still do not explain the substantial fall in productivity. This is demonstrated by evaluating net productivity, which removes from the calculation the time when equipment is down. The decline in net productivity was nearly identical to the decline in gross productivity. *Id.* at 23. Additionally, the fact that gross and net productivity declined for every crane further suggests that equipment problems do not explain

PAGE 13 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

the fall in productivity. For crane problems to explain the productivity decline, every crane must have developed problems immediately after June 1, when work stoppages and slowdowns as a result of the reefer dispute began, and those problems did not cause crane downtime but only slowed crane operations and were unable to be diagnosed or fixed in nearly a year. *Id.* at 24.

41.     Changes in management also do not explain the decline in productivity from July 19, 2012 through August 13, 2013. The people working for ICTSI at the terminal changed only marginally, with the most noteworthy change being former terminal manager Mullen transitioning to the new position of Director of Labor Relations. There was one short-term replacement, Mr. Walter Seidl, who left after a few months for family reasons. Mullen then returned to the position for a few months until long-time marine manager Yockey was promoted to terminal manager. The change from Seidle to Mullen and then to Yockey did not change productivity. Other changes in ICTSI staff in 2013 occurred well after the decline in productivity began and do not appear to correspond to any changes in productivity. *Id.* at 25-26.

42.     As analyzed in Dr. Ward's report, changes in the number and composition of union jobs also do not explain the decline in productivity from July 19, 2012 through August 13, 2013. *Id.* at 26-29.

43.     ALJ Wedekind similarly concluded that the ILWU and Local 8 engaged in deliberate slowdowns with an object of pressuring ICTSI to support Local 8 in its demand for the reefer work. Dkt. 65-4 at 61-70. ALJ Wedekind found credible the testimony of numerous ICTSI employees regarding the slowdowns and stoppages. ALJ Wedekind discredited the testimony of ILWU members that the slowdowns and stoppages were for safety and other reasons. ALJ Wedekind found persuasive the admission by Local 8 agents Bitz and Steven Cox that ILWU members were no longer working as productively because they were "upset" with ICTSI and

would no longer "take care of the company." *Id.* at 63. ALJ Wedekind also relied on certain findings by the standing area arbitrator that ILWU members had engaged in deliberate slowdowns.

44.    ALJ Wedekind also found that Respondents did not provide adequate notice to ILWU members of the July 19 Injunctive Order and that the ILWU Injunction Notice was "certainly not drafted to maximize the impact of the court's orders." *Id.* at 68.

45.    ALJ Wedekind issued conclusions of law that

> 1. By inducing and encouraging, since September 2012, longshoreman employed by ICTSI Oregon, Inc. at the Port of Portland to unnecessarily operate cranes and drive trucks in a slow and nonproductive manner, refuse to hoist cranes in bypass mode, and refuse to move two 20-foot containers at a time on older carts, in order to force or require ICTSI and carriers who call at terminal 6 to cease doing business with the Port, Respondents ILWU and Local 8 have engaged in unfair labor practices . . . .
>
> 2. Respondents ILWU and Locals 8 and 40 have not otherwise violated the Act in the manner alleged in the amended complaint.

*Id.* at 71-72.

**b.  The time period from August 14, 2013 through June 30, 2014**

46.    No admissible evidence was presented that specifies the gross and net productivity from August 14, 2013 through June 30, 2014. The parties do not dispute that productivity remained low during this time period and the Court finds generally that productivity did not substantially increase during this time period.

47.    ILWU members continued to raise numerous safety and contractual complaints and these complaints resulted in work stoppages and slowdowns. Petitioner asserts that these were "gimmicks" and not genuine disputes. Numerous declarations were submitted by ILWU members and ICTSI employees detailing various specific instances of alleged safety and other contract violations by ICTSI and alleged improper work slowdowns and stoppages by ILWU

PAGE 15 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

members. There were some standing area arbitration decisions upholding ILWU positions and some decisions siding with ICTSI. One dispute related to whether it was safe to operate the cranes in bypass mode. The Occupational Safety and Health Administration ("OSHA") found that operating cranes in bypass mode did not violate OSHA regulations. Dkt. 94 at 14-15. This OSHA decision does not, however, prove that the safety concerns were not legitimate at the time raised or that there were no violations of the PCLCD.

48.    The decreased productivity at Terminal 6 had a significant negative effect on the carriers, including Hanjin. In fall 2013, Hanjin indicated that it may stop calling at Terminal 6. In December 2013, Oregon Governor John Kitzhaber intervened in the dispute and called a meeting. The Port, DCTU, IBEW, ILWU, and ICTSI all participated in the meeting. As a result of these efforts, on December 12, 2013, the Port, IBEW, and DCTU entered into a work assignment agreement. Dkt. 65-6 at 7-9. Per the agreement, the Port would use a contractor (ultimately, Terminal Maintenance Corporation ("TMC")) to assign the reefer work to ILWU members for a temporary period of time. The agreed-upon time period would be from the date of the agreement through when the Port "believes that there is [a] reasonable prospect of labor productivity at Terminal 6 returning to and sustained at its historic levels." *Id.* at 8. After that condition was satisfied, the Port would have the option to relinquish its right to control the disputed work and the DCTU and IBEW would consent to such release. *Id.* Having the reefer work performed by ILWU members instead of IBEW members is significantly more expensive.

49.    ICTSI and ILWU offer contradicting accounts, through witness declarations, of how and why the agreement was reached. Sundet states that he made it clear at the meeting that the slowdowns and stoppages were caused by ICTSI's poor management and had nothing to do with the reefer work. Sundet further states that the Port's Executive Director, Wyatt, volunteered

that he could likely get IBEW to agree to cede the reefer work to Local 8 members and that Sundet noted the ILWU would not reject that work but again emphasized that the productivity issues were unrelated to that work. Sundet states that he did not promise that productivity would increase if the reefer jobs were reassigned to ILWU members. Sundet Decl. ¶¶ 15-17 (Dkt. 75 at 5-7).

50.    On the other hand, Wyatt states that Sundet assured Wyatt at the meeting that productivity at Terminal 6 would return to historic levels after the reefer work was assigned to ILWU members. Wyatt states that Sundet further indicated that, to support ILWU's litigation position and reduce the risk of damages, Sundet was concerned about connecting productivity to the reefer work and thus productivity would not immediately increase. Wyatt states that without an agreement from Sundet that productivity would increase, Wyatt never would have agreed to have the reefer work assigned, even for only six months, away from the longstanding and much less expensive IBEW labor. Wyatt stated that the "deal" was that ILWU members would immediately be assigned the reefer work, productivity would increase to historic levels after a reasonable time, and if it stayed at those levels for an extended period of time, the reassignment would become permanent. Wyatt Decl. ¶ 3 (Dkt. 83-4 at 3).

51.    Productivity at Terminal 6 did not improve as a result of the temporary reassignment of the reefer work.

52.    At a Port of Portland Commission meeting held on July 9, 2014, the Port requested additional funds of $525,000 to cover the increased costs of using ILWU labor for the six-month period. Stanton objected to the proposal and Wyatt stated that he was "assured" by an officer of ILWU that "conditions would return to some state of normality at Terminal 6 if we consented to work with the IBEW to give up the [reefer] work" but that productivity had not

improved and had, in fact, gotten worse. Dkt. 75 at 71. Wyatt further noted that he was "steaming" and "angry" because Sundet had "committed" during the Governor's mediation and ILWU had not followed through. *Id.* at 72. At that same meeting Pippenger stated that the DCTU gave the Port the right to permanently assign the reefer work to ILWU "upon the Port having the belief of likely or real improvement and productivity at the terminal." *Id.* at 74-75.

53.    Neither Sundet nor Wyatt testified live before the Court, so the Court was unable personally to evaluate the credibility of the witnesses. Looking at the context of the meeting and its surrounding circumstances, including the work assignment agreement and subsequent actions of the parties, however, the Court finds Wyatt's testimony to be more credible. The work assignment agreement was reached at a meeting that was focused solely on resolving productivity problems. The only resolution from the meeting was the reassignment of the work from IBEW members to ILWU members. The work assignment agreement expressly contemplated that as a result of the reassignment, productivity at Terminal 6 would improve. The work reassignment resulted in a significantly greater cost for the reefer work, which either had to be paid by the carriers or the Port. It is not credible that ICTSI would approve the deal and that DCTU, IBEW, and the Port would agree to transfer the reefer work away from the workers who had performed it for nearly 40 years, and at a much greater cost, without any corresponding agreement from ILWU relating to productivity. Additionally, Wyatt and Pippenger's statements at the Commission meeting are consistent with Wyatt's declaration before the Court. Although productivity did not improve as promised, that fact alone is not sufficient to prove that such a promise was not made. There are many possible reasons why productivity did not increase after the work was temporarily reassigned, including a desire to have the work permanently assigned

to ILWU members, a desire to have the Port concede that it never had the right to control the reefer work, or legal strategy relating to the several pending lawsuits.

54.    In approximately February 2014, Governor Kitzhaber ordered the Port to conduct an independent study of the equipment and maintenance of the equipment at Terminal 6. Dkt. 65-6 at 28. In March 2014, the Port hired Cardno TEC, Inc. ("Cardno") to review the container crane and rolling stock maintenance practices at Terminal 6. Dkt. 75 at 29. ICTSI and the Port participated in the review but the ILWU declined to participate. Cardno issued its final report on June 20, 2014. *Id.* at 28-57. Cardno concluded that: (1) the inventory of cranes is adequate; (2) the remaining service life issues need careful monitoring and planned investment; (3) coordination of major repairs needs improvement; (4) the Port should consider ensuring there are spare beams for immediate use as needed; (5) beam repair time is longer than industry norms; (6) the number of qualified mechanical personnel to work on crane beams is inadequate; (7) the rolling stock inventory is adequate; (8) approximately one-third of rolling stock was down for repairs; (9) more than half of the Reachstackers were down for maintenance more than 50 percent of the time in the preceding 12 months and repairs took much longer than they should have taken; (10) "red tag" procedures need centralized control; (11) the shop needs additional qualified mechanics to bring staffing to a level consistent with that of other similarly-sized West Coast ports; and (12) ILWU insight and input is critical for the remediation of some of the issues found by Cardno and all parties should work together or they risk the efficient operation of Terminal 6 and possibly jeopardizing property or worker safety. *Id.* at 29.

55.    Petitioner offers no microeconomic or regression analysis regarding the work stoppages and slowdowns from August 14, 2013 through June 30, 2014. Dr. Ward did not supplement his expert report to analyze this time period.

PAGE 19 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

### c.  The time period from July 1, 2014 through September 15, 2014

56.     The PCLCD expired by its own terms on July 1, 2014. Negotiations for a new labor agreement are ongoing. Lawful primary boycott activities have been and continue to take place in other West Coast ports in connection with the ongoing labor negotiation.

57.     On August 22, 2014, the Port informed Respondents that it had decided to terminate the temporary work assignment agreement assigning the reefer work to ILWU members because the agreement was based on the Port's expectation that productivity levels at Terminal 6 would increase, and they have not done so. Dkt. 65-6 at 33-34.

58.     No admissible evidence was presented that specifies the gross and net productivity from July 1, 2014 through September 15, 2014. The Court finds generally that productivity did not substantially increase during this time period.

59.     Petitioner offers no microeconomic or regression analysis regarding the work stoppages and slowdowns from July 1, 2014 through September 15, 2014. Dr. Ward did not supplement his expert report to analyze this time period.

60.     The parties offer declarations by ILWU members and ICTSI employees discussing a few specific instances of alleged safety and other contract violations by ICTSI and alleged improper work slowdowns and stoppages by ILWU members.

## CONCLUSIONS OF LAW

### A.  Laches

1.     Respondents argue that Petitioner's motion is barred by the equitable doctrine of laches.

2.     The affirmative defense of laches is unavailable against the federal government when it undertakes to enforce a public right or protect the public interest. *See Heckler v. Comty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 67 (1984) (Rehnquist, J., concurring)

(noting that as a general rule, laches is no defense to a suit brought by the government to enforce a public right or to protect a public interest); *United States v. Summerlin*, 310 U.S. 414, 416 (1940) ("[T]he United States is not . . . subject to the defense of laches in enforcing its rights."); *S.E.C. v. Silverman*, 328 F. App'x 601, 605 (11th Cir. 2009) (finding that the defense of laches is not available as a defense against the government); *United States v. Angell*, 292 F.3d 333, 338 (2nd Cir. 2002) ("[L]aches is not available against the federal government when it undertakes to enforce a public right or protect the public interest."); *Santiago v. Immigration and Naturalization Service*, 526 F.2d 488, 493 n.10 (9th Cir. 1975) ("'As a general rule laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest . . . .'" (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917))).

3.      Respondents argue that Petitioner is not acting to enforce a public right or protect a public interest because it is acting upon a charge originally filed by a private party, ICTSI. The parties cite to no decision from either the United States Supreme Court or the U.S. Court of Appeals for the Ninth Circuit, and the Court has found none, addressing whether the NLRB acts to enforce a public right or protect the public interest when the NLRB files a petition for civil contempt for an alleged violation of an injunctive order issued under Section 10(l) of the NLRA, 29 U.S.C. § 160(l). The Ninth Circuit, however, has applied laches when the NLRB files a petition to enforce an order of the Board under Section 10(e) of the NLRA, 29 U.S.C. § 160(e). *See NLRB v. Searle Auto Glass, Inc.*, 762 F.2d 769, 772 (9th Cir. 1985) (holding that because there is no statutory time limit on the filing of applications for enforcement of Board orders under Section 10(e), laches applies). Because there is no statutory time limit on the filing of applications for injunctive relief under Section 10(l), similar to Section 10(e), the reasoning for

applying laches in the 10(e) context may apply to an original petition under 10(l). This reasoning

does not, however, necessarily apply to the circumstances in which the Board has already

obtained an injunction under Section 10(l) and later seeks an order of contempt for an alleged

violation of that injunction.

4.      Regardless of whether laches is an available defense in petitions by the NLRB

seeking an order of civil contempt, such defense would fail in the current action. The defense of

laches requires that "[t]he party challenging the timeliness of a petition must show that more

time has elapsed than reasonably necessary and that it was prejudiced by the delay." *Id.*

Respondents fail to show either element.

5.      Respondents fail to show that the delay by the NLRB was unreasonable. This is a

complex labor dispute that has involved several cases before the NLRB, significant negotiation

amongst all the parties involved, and involvement by Oregon's Governor attempting to resolve

the dispute. It was reasonable for the Board to await adjudication by ALJ Wedekind regarding

whether Respondents acted in violation of the NLRA (and, thus, this Court's injunction).

Although ALJ Wedekind found on May 14, 2014 that ILWU and Local 8 continued to engage in

illegal secondary activity after this Court issued its injunction, it was not unreasonable for the

NLRB to wait approximately three and one-half months to file the pending civil contempt

motion. During that time period, the parties had agreed temporarily to reassign the disputed

reefer work to ILWU members and were waiting to see if productivity would increase and if the

alleged illegal activity would cease. The Court has found credible the testimony that the ILWU

promised slowly to increase the rate of production after the reefer work was reassigned, and

Petitioner's decision to wait a reasonable time period to see if the promised increase in

productivity would materialize before filing a civil contempt motion was reasonable. *See, e.g.*,

*N.L.R.B. v. Schill Steel Prods., Inc.*, 480 F.2d 586, 596 (5th Cir. 1973) (finding a two-year delay not unreasonable and noting that "[w]e do not encourage the N. L. R. B. to come to this court with contempt petitions as soon as they feel a violation of the order has occurred. This is especially true in the difficult area of labor relations where the Board may not be able to determine whether or not a significant violation has occurred until it has already done lengthy investigation, possibly including a full Board proceeding.").

6.      Respondents also fail to show that they were prejudiced by the delay. "Mere delay is not enough to show laches." *N.L.R.B. v. P*I*E Nationwide, Inc.*, 894 F.2d 887, 894 (7th Cir. 1990) (citing *Gardner v. Panama R.R.*, 342 U.S. 29 (1951) (per curiam)). The NLRB has not gained any advantage and the consequences Respondents face are the same now as they would have been if Petitioner had filed its petition earlier. Thus, Respondents fail to show prejudice. *See, e.g.*, *U.S. Can Co. v. N.L.R.B.*, 254 F.3d 626, 630 (7th Cir. 2001) (finding no prejudice where the obligation of the respondent would have been the same had the NLRB filed its petition for enforcement sooner); *Searle*, 762 F.2d at 773 ("Thus, by its delay, the NLRB did not gain any advantage it did not originally have, and the Company suffered no prejudice.").

7.      The Court declines to apply the defense of laches to the pending petition.

## B. Civil Contempt

### a. Legal standards

8.      The Court has jurisdiction over the parties and over the subject matter, pursuant to 29 U.S.C. § 160(l). The Court has the authority to issue injunctive relief. 29 U.S.C. § 160(l).

9.      The Court issued a preliminary injunction in this case. The Court "has the power to adjudge in civil contempt any person who willfully disobeys a specific and definite order of the court." *Gifford v. Heckler*, 741 F.2d 263, 265 (9th Cir. 1984). The "decision to hold a party in contempt of a court order rests with the sound discretion of the trial court." *Transgo, Inc. v. Ajac*

*Transmission Parts Corp.*, 768 F.2d 1001, 1022 (9th Cir. 1985). "A person fails to act as ordered by the court when he fails to take all the reasonable steps within his power to insure compliance with the court's order." *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146-47 (9th Cir. 1983) (internal citations and quotation marks omitted). Despite this broad discretion, however, the "judicial contempt power is a potent weapon" that must be exercised with care. *See Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).

10.     The "test for civil contempt is whether the alleged contemnor (1) violated a court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *Kukui Gardens Corp. v. Holco Capital Group, Inc.*, 675 F. Supp. 2d 1016, 1023 (D. Haw. 2009) (citing *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)); *see also N.L.R.B. v. San Francisco Typographical Union No. 21*, 465 F.2d 53, 57 (9th Cir. 1972) (applying clear and convincing standard to allegations of contempt of § 10(l) preliminary injunction). The "moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *Stone v. City & County of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992). Clear and convincing evidence "requires more than proof by a preponderance of the evidence and less than proof beyond a reasonable doubt." *Singh v. Holder*, 649 F.3d 1161, 1168 (9th Cir. 2011). To meet the clear and convincing standard, "a party must present sufficient evidence to produce 'in the ultimate factfinder an abiding conviction that the truth of its factual contentions are . . . highly probable.'" *Sophanthavong v. Palmateer*, 378 F.3d 859, 866 (9th Cir. 2004) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

11.     Although the preliminary injunction is broadly worded, the allegations of improper secondary boycott activities are that Respondents are engaging in the alleged conduct

with a purpose of exerting pressure on ICTSI and the carriers to cease doing business with the Port in order to force the Port to assign the reefer work to ILWU members or provide ICTSI with the right to control the assignment of the reefer work. Thus, for Respondents' alleged contumacious conduct to violate the Court's injunction, it must have a purpose related to the dispute over the reefer work.

**b. Allegations of contempt relating the notice requirement**

12.     Petitioner argues that Respondents failed properly to post the injunction and the required notice. Petitioner also argues that the ILWU Injunction Notice violated the injunction because it did not provide a clear written directive to refrain from engaging in any conduct inconsistent with the injunction and, to the contrary, stated that the Court's decision was wrong and that ILWU would prevail.

13.     The evidence does not clearly and convincingly show that Respondents did not properly post the notice. Counsel for Respondents provided a copy of the injunction and the ILWU Injunction Notice to Respondents and both documents were posted at Terminal 6 and Local 8. Although there is no first-hand testimony that the documents were posted at Local 92 or Local 40, there is not clear and convincing evidence that they were not posted in those locations. Further, counsel for Respondents testified that to the best of his knowledge, they were posted at Local 40 and Local 92.

14.     The Court does not find persuasive the testimony before ALJ Wedekind by a few ILWU members that, nearly 18 months after the injunction was issued, those members did not recall seeing the posted injunction and ILWU Injunction Notice. Although that testimony is credible, the lack of recollection by a few people is not dispositive of whether the documents were posted. The Court has additional evidence it before it that was not before ALJ Wedekind,

including the declarations of Bitz and Miken and the photographic evidence, and this evidence is persuasive.

15.     The evidence also does not clearly and convincingly show that Respondents failed to provide a clear written statement that ILWU members not engage in conduct that violates the injunctive order. Although the ILWU Injunction Notice states that the ILWU disagrees with the Court's injunction, intends to appeal, and believes that the ILWU position will ultimately prevail, the ILWU Injunction Notice specifically asks that ILWU members refrain from engaging in conduct prohibited by the injunction.

### c. Allegations of contempt relating to alleged work stoppages and slowdowns from the time period July 19, 2012 through August 13, 2013

16.     The evidence clearly and convincingly shows that during the time period from July 19, 2012 through August 13, 2013, the ILWU and Local 8 have violated the Court's order by inducing and encouraging their members to engage in work stoppages and slowdowns with an object to coerce ICTSI and the carriers to force the Port to cede the right to control the reefer work or assign the reefer work to ILWU members. Work stoppages and slowdowns regularly continued during this time period. Although the dramatic reduction in productivity that began June 1, 2012 improved after the Court's injunctive order, it remained lower than the historic average during the July 19, 2012 through August 13, 2013 time period. Average gross productivity was 3.1 moves below the pre-June 2012 period and average net productivity was 3.7 moves lower. This reduction in productivity was significant and economically meaningful.

17.     The parties dispute whether that decline in productivity was for a purpose of forcing the Port to assign the reefer work or was based on primary disputes with ICTSI over safety concerns, contract disputes, and labor disputes. A violation may be found even if the alleged purpose is not the *sole* object of the conduct, as long as it is one of the objectives. *See,*

*e.g.*, *N.L.R.B. v. Denver Bldg. and Construction Trades Council*, 341 U.S. 675, 689 (1951);

*Roofers Local 30 v. N.L.R.B.*, 1 F.3d 1419, 1424 (3d Cir. 1993); *N.L.R.B. v. Musicians Union,*

*AFM Local 6*, 960 F.2d 842, 845 (9th Cir. 1992). The injunction here prohibited works stoppages

and slowdowns with "an object" of coercing ICTSI or others to cease doing business with the

Port for purposes of obtaining the reefer work. There is substantial evidence that the reefer work

was at least *an* object of the work stoppages and slowdowns during this time period. First, there

were specific threats made by ILWU and Local 8 members. They threatened that if the reefer

work was not assigned to ILWU members, the ILWU would shut down ICTSI and force Hanjin

not to renew its contract, all to the detriment of the Port, among others. Second, the correlation

between the timing of the labor dispute regarding the reefer work and the work slowdowns is

evidence that the dispute over the reefer work was an object of the slowdowns. This includes the

fact that after ICTSI had been managing Terminal 6 for more than one year productivity was at a

historical high and yet plummeted on June 1, 2010, after the threats relating to the labor dispute

over the reefer jobs. Third, the microeconomic and regression analyses performed by Dr. Ward,

the admissions by Bitz and Steven Cox that ILWU members were not working as productively

anymore because they were "upset" and would not "take care of the company" any more, and the

fact that both ALJ Schmidt and ALJ Wedekind found the testimony from ICTSI witnesses to be

credible and the testimony from ILWU witnesses to be less credible all support this conclusion.

Finally, this Court finds credible Wyatt's testimony that Sundet promised to increase

productivity at Terminal 6 if the reefer jobs were assigned to ILWU members, which is further

evidence that at least "a purpose" of the slowdowns and stoppages was related to the reefer jobs.

  18. The other explanations provided by Respondents for the stoppages and

slowdowns do not fully explain the conduct, as discussed in Dr. Ward's expert report.

Additionally, Respondents' argument that many of the work stoppages and slowdowns were done in response to an action by ICTSI, such as firing an ILWU member or docking pay for late arrival, is not persuasive. The Court finds such actions by ICTSI to be the byproduct of the labor dispute over the reefer jobs and not the source of the decline in productivity. *See* Dkts. 65-4 at 69; 104-16 at 26. As aptly stated by ALJ Wedekind, "[t]o disregard such a connection or relationship in evaluating the object of union action would ignore industrial realities and potentially discourage employers from engaging in self-help efforts to prevent or document continued unlawful conduct." Dkt. 65-4 at 69-70; *see also Hoffman v. Beer Drivers and Salesmen's Union Local No. 888*, 536 F.2d 1268, 1275 (9th Cir. 1976) (noting that in considering allegedly contumacious actions, the entire record should be viewed and it not appropriate to "treat each of the findings of violation as though each particular incident had happened without any relationship to any of the other incidents which occurred over a period of time"). Further, even if a few specific instances of work stoppages or slowdowns were motivated by a legitimate primary purpose, the work stoppages and slowdowns have been ongoing and in considering the overall record during this time period, the Court finds that at least "an object" of the slowdowns and work stoppages was to leverage ICTSI and the carriers to force the Port to cede the right to control the reefer work or to assign the reefer work to ILWU members.

19.     The parties also dispute whether Respondents are responsible for the alleged conduct. There is direct evidence from May and June 2012 that ILWU and Local 8 agents and officers specifically threatened to engage in coordinated acts to shut down ICTSI, drive Hanjin out of the Port, and otherwise attempt to force the Port to assign the reefer work to ILWU members. There is also direct evidence that Local 8 agents and officers themselves engaged in work slowdowns and stoppages. Further, there is ample circumstantial evidence that the agents

and officers of the ILWU and Local 8 continued to direct, encourage, or coordinate the work stoppages and slowdowns during the July 20, 2012 through August 13, 2013 time period.[7] Multiple ILWU members engaged in the same conduct, such a driving the "scenic route" around the yard, engaging in pretextual safety complaints, and deliberately operating cranes more slowly. Dkt. 65-4 at 70. This is indirect evidence of concerted or coordinated conduct. Further, Dr. Ward's statistical analysis shows that the productivity of every crane and nearly every crane operator remained depressed throughout the entire time period, which would be "a remarkable coincidence" if it were not a coordinated effort. Dkts. 104-15 at 59, 104-16 at 10. Circumstantial evidence is sufficient to show responsibility. *See, e.g.*, *United Scenic Artists, Local 829, Broth. of Painters and Allied Trades, AFL-CIO v. N.L.R.B.*, 762 F.2d 1027, 1035 n.26 (D.C. Cir. 1985); *N.L.R.B. v. Union Nacional de Trabajadores*, 540 F.2d 1, 8-9 (1st Cir. 1976); *Iron Workers Local 272 (Presstress Erectors)*, 172 NLRB 207 (1968), enfd. 427 F.2d 211 (5th Cir. 1970).

20.    Additionally, even if the ILWU and Local 8 did not direct or coordinate the conduct, there is compelling evidence that they effectively condoned or ratified the conduct and are thereby properly held accountable. *See Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (holding that a union can be held responsible if it ratifies or condones the improper conduct and that ratification occurs when the union fails to take measures to stop the illegal conduct or the union's efforts to stop the illegal conduct are so minimal that approval or encouragement can be inferred); *Iron Workers Dist. Council of Pac. N.w. v. N.L.R.B.*, 913 F.2d

---

[7] Although Local 8 members were the ones engaged in the actual conduct, Sundet (from the ILWU) talked to Local 8 daily, and assisted, advised, and guided it with respect to the work stoppage and slowdown issues. Dkt. 65-4 at 71; *see also* Dkt. 104-18 at 60 (minutes from a January 16, 2013 meeting of various local ILWU members and officers that Sundet attended noting that "the area needs a cohesive direction to defend the ILWU collectively against ICTSI's attempts to undermine our collective bargaining"); Dkt. 104-18 at 65 (minutes from a similar April 9, 2013 meeting in which Local 8 asked for "continued assistance" in documenting difficulties with ICTSI).

PAGE 29 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

1470, 1477 (9th Cir. 1990) (noting that a union can be held responsible if it "instigated, authorized, solicited, ratified, condoned or adopted" the unlawful conduct) (quotation marks and citation omitted). Here, ILWU and Local 8 knew about the slowdowns and work stoppages, knew they continued even after the ILWU Injunction Notice was posted, and took no measures to stop the conduct. Thus, ILWU and Local 8 condoned and ratified the conduct.

21.    The evidence does not, however, clearly and convincingly show that Local 40 violated the Court's order. Petitioner provides very little evidence of Local 40's involvement in the alleged work stoppages and slowdowns. Petitioner does not provide evidence that any officers or agents of Local 40 threatened ICTSI or engaged in or encouraged work stoppages or slowdowns or of Local 40 members engaging in any improper conduct during this time period.[8] In fact, one of Petitioner's witnesses states that well before the labor dispute, there was a problem getting Local 40 registered clerks to work at Terminal 6 because other jobs were considered more desirable. Yockey Decl. ¶ 39 (Dkt. 83-1 at 25). The Court finds that Petitioner fails to meet its burden to show that Local 40 violated the Court's order.

### d.    Allegations of contempt relating to alleged work stoppages and slowdowns from the time period August 14, 2013 through June 30, 2014

22.    Petitioner's argument with respect to the time period of August 14, 2013 through June 30, 2014, appears to be that because there is sufficient evidence that Respondents engaged in unlawful secondary boycott activities in violation of the Court's order from July 20, 2012 through August 13, 2013, the same must be true for this time period. Petitioner offers testimony through declarations that ILWU members have continued to complain of equipment and safety problems, have stopped working cooperatively with ICTSI, and have continued to engage in

_____

[8] It appears that the only evidence of alleged improper work slowdown or stoppages by a Local 40 member is from September, 2014. That time period is discussed below.

work stoppages and slowdowns. Petitioner argues that the alleged safety concerns and equipment problems did not suddenly become valid when they were previously motivated by the reefer dispute. Although this argument has some appeal, it does not satisfy the clear and convincing evidentiary standard.

23.    Petitioner offers no admissible evidence of the productivity statistics during this time period.[9] No witnesses testified live before the Court, so the Court has only declarations from ICTSI employees discussing the alleged improper slowdowns and stoppages, contrasted by declarations from ILWU members asserting legitimate reasons for those alleged slowdowns and stoppages. Net productivity numbers might support Petitioner's argument that equipment issues were not the cause of the decline in productivity, but Petitioner did not offer any admissible evidence of net productivity during this time period. Petitioner also offers no microeconomic or regression analyses demonstrating that the other reasons asserted Respondents were not causing the alleged stoppages and slowdowns during this time period. For example, Dr. Ward's analysis for the July 20, 2012 through August 13, 2013 time period demonstrated that, even assuming all of the equipment complaints by ILWU members were legitimate, those equipment problems could not explain the decline in productivity. Dr. Ward performed similar regression analyses for the other alleged causes of the decline in productivity argued by ILWU. No such analyses, however, were provided for this time period.

24.    Without a supplemental expert report by Dr. Ward or other similar evidence, Petitioner fails to show by clear and convincing evidence that the reefer dispute, versus the numerous other reasons argued by the ILWU, was at least an object of the decline in

_____

[9] The Court excluded a productivity chart purportedly prepared by Dr. Ward because it failed to comply with Federal Rule of Evidence 1006 and was not properly authenticated. For the same reasons, the Court excluded a chart purportedly prepared by Randy Fischer.

productivity. The report by Cardno is insufficient evidence because although it concludes that there is an adequate inventory of cranes, it also concludes that repairs are taking much longer than they should, that the number of qualified mechanics is inadequate, and that coordination of major repairs needs improvement. Most importantly, the report does not perform a regression analysis to determine whether the crane problems can explain the decline in productivity.

25.    Although it may appear incongruous that conduct on August 13, 2013 can be considered in violation of the July 19 Injunctive Order and the same conduct on August 14, 2013 would not be, such a result is necessary based on the high evidentiary burden on Petitioner and the lack of admissible evidence relating to the decline in productivity and its causation provided to the Court for the time period after August 13, 2013.

> **e.    Allegations of contempt relating to alleged work stoppages and slowdowns from the time period July 1, 2014 through September 15, 2014.**

26.    The allegations of contempt for the time period of July 1, 2014 through September 15, 2014 suffer from the same evidentiary flaws as those from August 14, 2013 through June 30, 2014. In addition, the allegations relating to the time period after July 1, 2014, ignore the critical fact that the PCLCD expired on July 1, 2014. The ILWU is now involved in labor negotiations for a new contract, and that may be an intervening and superseding cause for primary boycott activity. The NLRB recognizes that an intervening or superseding cause may arise in labor disputes that affect the causation analysis. *See, e.g.*, *Case Farms of N. Carolina, Inc. and Western N. Carolina Workers Center*, 353 NLRB 257, 279 (2008); *Pilot Freight Carriers, Inc.*, 265 NLRB 129, 132 (1982). Thus, during the time that labor negotiations are ongoing, Petitioner must show by clear and convincing evidence that any alleged work stoppages and slowdowns are not motivated by the intervening primary labor dispute, which affects all

aspects of longshoremen employment along the entire West Coast, and that the dispute over two reefer jobs at Terminal 6 remains an object of the alleged conduct. Petitioner fails to do so.

### f.  Remedy

27.     Petitioner seeks as a compensatory remedy its costs and expenses in pursuing the civil contempt motion. Petitioner also seeks a prospective fine schedule with significant initial and daily fines for any future noncompliance.

28.     Petitioner also seeks a purgation order requiring Respondents to: (1) fully comply with the July 19 Injunctive Order; (2) sign a notice within 24 hours, to be approved by the Court prior to distribution, stating that Respondents were found in contempt of the July 19 Injunctive Order, denouncing that conduct, explaining the terms of the July 19 Injunctive Order, directing Respondents and their officers, agents, employees, attorneys, and members to refrain from similar conduct, and stating that any previous communications that Respondents may have made inducing or encouraging such conduct are withdrawn and disavowed; (3) distribute the notice within 48 hours without any accompanying notices, letters, or disclaimers of any kind; (4) file affidavits of compliance with the Court within three days of distributing the notice; and (5) distribute the notice for six months at all union gatherings.

29.     The purpose of a civil contempt order can be coercive (to promote future compliance with the court's order) or remedial (to compensate for the costs of the contumacious conduct), or both. *See N.L.R.B. v. Int'l Longshore and Warehouse Union, Locals 21 and 4*, 721 F.3d 1122, 1129-30 (9th Cir. 2013). "Respondents who are found in civil contempt 'are commonly required to pay . . . the expenses incurred by the Board in the investigation, preparation and presentation of contempt proceedings.'" *N.L.R.B. v. James Troutman & Assocs.*, 1994 WL 397338, at *8 (9th Cir. 1994) (quoting *N.L.R.B. v. Crown Laundry & Dry Cleaners, Inc.*, 437 F.2d 290, 295 (5th Cir. 1971)).

PAGE 33 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

30.    The U.S. Court of Appeals for the Ninth Circuit has found that requiring parties found in contempt to mail the contempt adjudication and the Board notice outlining the contempt findings to all employees or agents is an appropriate remedial action. *See, e.g.*, *James Troutman & Assocs.*, 1994 WL 397338, at \*7; *NLRB v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628, 631 (9th Cir. 1977).

31.    Because Petitioner has only met its burden to prove contempt for the time period from July 20, 2012 through August 13, 2013, and because the Court is cognizant of the effect that the termination of the PCLCD has created with respect to the labor dispute, the Court declines at this time to impose a prospective fine schedule and ORDERS as follows:

a.    Respondents shall conduct themselves in all respects consistent with the July 19 Injunctive Order and not in any way, by action or inaction, conduct, engage in, induce, encourage, permit, ratify, or condone any violation of that Order.

b.    Within seven (7) days, Respondents shall distribute and post copies of this contempt adjudication along with an appropriate notice, in the form prescribed by Petitioner and signed by an appropriate officer on behalf of the ILWU and Local 8. This notice shall state that the ILWU and Local 8 have been adjudged in civil contempt for violating and disobeying the Court's July 19 Injunctive Order for the time period from July 20, 2012 through August 13, 2013 by engaging in work stoppages and slowdowns with an object of coercing ICTSI or the carriers to force the Port to assign the reefer work to ILWU members or to cede control over the assignment of the reefer work and that the ILWU and Local will undertake the actions directed by this Court. The notice shall also remind ILWU member of the July 19 Injunctive Order and provide another clear written directive to refrain from engaging in any conduct inconsistent with

that Order. The Court shall resolve any objections by Respondents to the form of order prescribed by Petitioner.

   c.    Respondents shall cause a copy of the notice and contempt adjudication to be mailed or emailed, at Respondents' election, individually to all members of Local 8, Local 40, and Local 92 and shall submit a list of such members to the Regional Director of the NLRB, with proof of mailing or emailing. Respondents shall also cause a copy of the notice and contempt adjudication to be provided to the officers and agents of the ILWU, Local 8, Local 40, and Local 92, and to the PMA and all the entities set forth in Exhibit A to the July 19 Injunctive Order.

   d.    Respondents also shall cause the notice and contempt adjudication to be posted in conspicuous places where notices to employees and members are customarily posted at the union halls and Terminal 6. The notice and the copies of the contempt adjudication shall be maintained in clearly legible condition for a period of not less than ninety (90) days and shall not be defaced, altered, or covered by any other material.

   e.    The notice shall be read, by an appropriate officer, at the next three regularly scheduled meetings of the membership of Local 8, Local 40, and Local 92.

   f.    Within fourteen (14) days, Respondents shall file with the Court sworn affidavit(s) from a responsible official(s) with personal knowledge that describes with specificity how Respondents have complied with the notice requirements of this contempt adjudication.

   g.    Respondents shall pay to Petitioner all reasonable costs and expenses, including reasonable attorney's fees or salaries, incurred by Petitioner in the investigation, preparation, presentation, and final disposition of this proceeding. Petitioner shall file within sixty (60) days a certified statement of such costs and expenses and serve a copy of such

PAGE 35 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

statement on Respondents. Respondents may respond within thirty (30) days after service, and Petitioner may reply within fourteen (14) days thereafter.

**CONCLUSION**

Petitioner's motion for an order to show cause and petition for civil contempt (Dkt. 65) is GRANTED IN PART AND DENIED IN PART as set forth herein.

**IT IS SO ORDERED**.

DATED this 16th day of December 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge